J-S13027-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| J.A.C. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| M.J.C. | : | No. 1652 WDA 2018 |

Appeal from the Order Entered October 25, 2018
In the Court of Common Pleas of Erie County
Civil Division at No(s):  No.12211-2017

BEFORE:   BENDER, P.J.E., OTT, J., and STRASSBURGER*, J.

MEMORANDUM BY OTT, J.:                                FILED MAY 8, 2019

J.A.C. ("Mother") appeals from the order entered October 25, 2018, in the Court of Common Pleas of Erie County, which reinstated the previous custody order entered May 10, 2018, with certain modifications.  The May 10, 2018 order awarded Mother and M.J.C. ("Father") shared legal custody of their daughters, K.C., born in February 2005, and M.C., born in September 2007 (collectively, "the Children").  The order further awarded Mother sole physical custody of K.C. and primary physical custody of M.C., and changed Father's partial physical custody of M.C. from supervised to unsupervised.  After careful review, we vacate and remand with instructions.

We summarize the facts and procedural history of this matter as follows. Mother and Father are married but separated.  Prior to these proceedings, the parties resided together with the Children and with Mother's daughter from a previous relationship, R.K.  The record indicates that, in January 2017, Father

_____
*   Retired Senior Judge assigned to the Superior Court.

made statements of a sexual nature to R.K., who was seventeen years old at the time. The exact substance of Father's statements does not appear in the certified record, but Mother testified that he told R.K. that he "had a crush on her," that he "wanted to date her," and that he and Mother "hadn't had sex for so many months."[1] N.T., 10/22/18, at 61. R.K. relayed these statements to Mother, resulting in the parties' separation.

On August 3, 2017, Mother filed a complaint requesting sole legal and primary physical custody of the Children. In addition, Mother requested that Father receive supervised partial physical custody through a mutually agreed upon third party, or through Erie Family Center. Mother averred that she had been providing Father with supervised partial physical custody of the Children pursuant to an informal agreement, but that the individual who had been supervising Father's custody would no longer be able to do so. The parties attended a conciliation on January 31, 2018, and signed a consent agreement, which the trial court entered as a temporary order on February 5, 2018.[2] The order awarded the parties shared legal custody. It further awarded Mother

_____

[1] Father admitted during the custody proceedings that he made an "improper statement" to R.K. on "January 7th to 8th, 2017." N.T., 4/25/18, at 69. He reported to his counselor that he told R.K. "he had a crush on her." Exhibit A (Evaluation & Treatment Summary).

[2] At a point unspecified in the record, Father agreed to undergo a psychological evaluation, which he completed by the time of the conciliation. The evaluation report, prepared by Peter von Korff, Ph.D., does not appear in the certified record.

primary physical custody of the Children and Father supervised partial physical custody at Erie Family Center on Monday and Thursday evenings.

The trial court held a hearing on Mother's complaint on April 25, 2018, which it began by interviewing K.C. in camera. K.C. stated that she had been attending Father's supervised partial physical custody with M.C., but that she stopped attending when she learned of Father's statements to R.K. N.T., 4/25/18, at 9-10. K.C. recounted that she learned of Father's statements by speaking to R.K. and Mother, and that she does not want to see or talk to Father. Id. at 9, 11-14. She added that she had participated in counseling in the past and agreed that additional counseling may be beneficial. Id. at 10, 14-15.

The trial court next heard testimony from Mother. Mother testified that she informed K.C. of "some . . . but not all" of Father's statements to R.K., because K.C. was becoming agitated and withdrawn and "was really needing some answers." Id. at 20-21. Mother proposed that K.C. should not have any further contact with Father unless it occurs in a "controlled environment . . . . maybe with a counselor with her."[3] Id. at 21. Conversely, she testified that M.C. remains oblivious to Father's statements and wants to continue spending time with him. Id. at 22. Mother insisted that the risk Father poses

_____

[3] Mother stated that she had located a counselor for K.C. N.T., 4/25/18, at 24.

to M.C. would increase as she reaches her teen years, as R.K. was a teenager when Father made his statements toward her, and that his contact with M.C. should continue to be supervised.[4]  Id. at 22.  She added, "He saw [R.K.] as his own.  He even said that he loved her as his own.  I don't believe he would be any different with the other two."  Id. at 26.

Finally, the trial court heard testimony from Father.  Father testified that he had made an effort to cooperate with Mother's requests and convince her that he does not pose a threat to the Children.  Id. at 33-34.  He reported that he attended counseling with his pastor for the last fifteen months, but that he would be willing to seek treatment from a new counselor as well.  Id. at 35.  He agreed that he should not resume seeing K.C. immediately but proposed that he "would like to see her in counseling, getting the help that she needs with also a direction toward reunification."  Id. at 36-37.  He further agreed that reunification should not begin until "the counselor says that [K.C.] is ready."  Id. at 38.  With regard to M.C., Father proposed that he would "like to see her 50 percent of the time starting now, realizing that there may have to be some small bit of reunification counseling to go on both for her and for me, . . . with that starting immediately."  Id.

_____

[4] After the incident with R.K., Mother learned from Father's ex-wife that he had exposed himself to his fifteen-year-old sister-in-law decades ago during his previous marriage.  N.T., 10/22/18, at 56.  Mother stressed that Father's sister-in-law was also a teenager at the time of that incident.  N.T., 4/25/18, at 22.

Following the hearing, on May 10, 2018, the trial court entered a final custody order, which awarded shared legal custody to both parties. The order awarded sole physical custody of K.C. and primary physical custody of M.C. to Mother.[5] The order awarded unsupervised partial physical custody of M.C. to Father beginning at the conclusion of the 2017-2018 school year on Mondays and Wednesdays from 5:00 p.m. until 9:00 p.m., and on Saturdays from 10:00 a.m. until 9:00 p.m. Moreover, the order awarded unsupervised partial physical custody of M.C. to Father each weekend, beginning at the start of the 2018-2019 school year, from Friday after school until Sunday at 6:00 p.m.

On June 5, 2018, Mother filed a motion for emergency relief. Mother averred that Father's periods of unsupervised partial physical custody of M.C. would begin the following day. However, she averred that Erie Family Center was recommending against unsupervised custody due to alleged inappropriate behaviors by Father. She attached a report from Erie Family Center, detailing these behaviors. She requested that Father's unsupervised custody of M.C., and any attempt at reunification with K.C., remain suspended until Father completes additional counseling. The trial court entered an order on June 5, 2018, directing that Father would continue to exercise only supervised partial physical custody of M.C. pending further order of court.

_____

[5] The order provided that Mother would select counselors for Father and K.C., and that Father would not exercise custody of K.C. "until such time as an independent counselor would recommend that such visitation is appropriate." Order, 5/10/18, at ¶ 2(c).

On August 3, 2018, the trial court entered a consent order, permitting Father to exercise supervised partial physical custody of M.C. at his home, facilitated by Erie Family Center. The order further directed Father to undergo counseling with licensed professional counselor, George Dowd, "to address the issues identified in the Erie Family Center report as well as his inappropriate behaviors toward minor girls." Order, 8/3/18.

The trial court conducted a hearing on Mother's motion for emergency relief on October 22, 2018, during which Mother presented the testimony of Erie Family Center visit supervisor, Margie Olszewski. Ms. Olszewski testified that she began supervising Father's custody of M.C. in August 2017. N.T., 10/28/18, at 29. She reported that Father's custody went well for eight or nine months, but that, after learning he would receive unsupervised custody, Father began displaying "questionable behavior[.]" Id. at 29-30. Specifically, Ms. Olszewski reported that Father began sitting next to M.C. when they ate together and on at least one occasion placed his head on her shoulder. Id. at 31, 37. She recalled additional incidents during which Father instructed the Siri application on his smartphone to "call me sexy," and showed M.C. a video of "Bill Cosby . . . doing some comedy talking about dating and dating women[.]"[6] Id. at 31. Ms. Olszewski described another incident during which

_____

[6] Ms. Olszewski may have conflated two separate incidents. The Erie Family Center report indicates that Father "played some old Bill Cosby audio stand-up comedy from [You]Tube . . . where his son got his tonsils out" on April 2,

M.C. "crossed her hands over her shoulders and pretended like she was making out with somebody but [Father] never said like that's inappropriate, or anything like that." Id. at 32. She also described an incident during which Father and M.C. "were like playing hide and go seek and he picked her up and threw her on the couch." Id. at 36. Finally, Ms. Olszewski recalled an incident during which Father stated to M.C. that he had "kissed a girl, I kissed her long and I kissed her hard," quoting the film "The Sandlot," which M.C. told Father she had watched. Id.; Exhibit 3 (Erie Family Center report explaining the film quote).

Ms. Olszewski acknowledged that Father's periods of supervised partial physical custody had "gone back to what they were initially without incident." N.T., 10/28/18, at 33. Nonetheless, based on Father's recent inappropriate behaviors, she recommended that his custody "remain supervised, and that he continue to have therapy." Id. at 34-35, 42. She recommended that his custody should remain supervised until M.C. "understands what happened, and that she is of a maturity to be able to look for a warning signal or flags." Id. at 42. She stated, "one or two incidents[] may have not been totally alarming to me . . . but together in that time frame it was -- it didn't bode well with me." Id. at 32.

_____

2018. Exhibit 3. The report indicates that, on May 17, 2018, Father showed M.C. a YouTube video "about a comedian's rendition of his dating experience!! Not appropriate!!" Id.

The trial court also heard testimony from Mother. Mother requested that Father's custody remain supervised pursuant to the recommendation of Erie Family Center. Id. at 47. She suggested that Father's custody remain supervised "until it's clear that there is absolutely no risk to [M.C.] anymore." Id. Mother reported that she has not informed M.C. of Father's statements to R.K. and that she would do so "[o]nly if it becomes necessary . . . I have discussed it with her counselor, and . . . it may become appropriate in the future." Id. at 48. At a minimum, Mother suggested that the counselor should educate M.C. regarding "things to look for in a sexually inappropriate situation and how to get out of those," without providing the details of Father's statements. Id. at 48, 50, 58. Mother also expressed concern that the court's custody award would permit Father to attend M.C.'s swim meets, at which K.C. would also be present, which would be "upsetting and disturbing" to K.C. Id. at 49.

Additionally, the trial court heard testimony from Father's counselor, Mr. Dowd. Mr. Dowd testified that he has been providing weekly counseling to Father. Id. at 4, 15. He reported that Father's "therapeutic involvement has been very good. He's been very open and honest[,]" and that his "prognosis looks very positive at this point." Id. at 6. He added, "I certainly don't see him as a threat to perpetrate any type of assault or crimes . . . he's very remorseful and he's taken full responsibility." Id. at 6-7. Concerning Father's behaviors during his recent custody of M.C., Mr. Dowd blamed "[t]he optics of

the situation given the scrutiny" that Father was under. Id. at 9. He opined, "I really don't think there was any ill intent but certainly because he's being observed and supervised with his visits, you know, some judgment issues . . . could have been handled in a different manner." Id. With respect to Erie Family Center's recommendation that Father's custody remain supervised, Mr. Dowd stated, "I just don't see a need for that at this point, based on his past behavior in our therapy sessions that I'm seeing." Id. at 23.

Finally, the trial court heard testimony from Father. Father insisted once again that he had tried to do everything possible to cooperate with Mother's requests and for "our family to be healed." Id. at 70-73. He also maintained that he did not intend his recent behaviors toward M.C. to be sexual. Father agreed that he had placed his head on M.C.'s shoulder but stated that he had done so previously and that "[a]pparently Margie didn't see me do it before." Id. at 74. He also stated that there was nothing unusual about him sitting next to M.C. Id. at 74-75. Father admitted that he asked the Siri application on his phone to "call me sexy" and that this behavior had been inappropriate. Id. at 75. He stated that he saw a character do the same thing on the "The Big Bang Theory" television show, and was "just -- trying to make a joke[.]" Id. Finally, concerning the allegation that he showed M.C. an inappropriate video, Father stated, "[i]t was a video, it wasn't Bill Cosby . . . . About ten seconds into it I realized it wasn't appropriate, I couldn't tell that by the title of it, so I shut it off." Id. at 74. Father suggested that he engaged in these

inappropriate behaviors because "it was just a relief. We had been going through supervised visits for, [at] that point in time, . . . a year plus four months, five months, and it was just, okay, we're finally going to get our lives back, you know, into a normal state and I honestly -- I -- I screwed up." Id. at 78. Father maintained that he intended to continue receiving counseling from Mr. Dowd, and proposed that he should receive shared physical custody of the Children, although he was not "pressing or pushing" to have custody of K.C. immediately. Id. at 76.

On October 25, 2018, the trial court entered the order complained of on appeal, which reinstated the previous order of May 10, 2018, subject to certain modifications.[7] The order provided that Father would exercise unsupervised partial physical custody of M.C. beginning on Monday, October 29, 2018. As was the case in the previous order, Father would exercise custody on Mondays and Wednesdays from 5:00 p.m. until 9:00 p.m., and on Saturdays from 10:00 a.m. until 9:00 p.m. Beginning in January 2019, Father would exercise custody each weekend, from Friday after school or 5:00 p.m. if there is no school, until Sunday at 6:00 p.m. The order contained additional provisions prohibiting Father from appearing at K.C.'s swim meets and practices, and directing Father to continue with counseling "for as long as deemed necessary

_____

[7] The Honorable Shad Connelly presided over the April 25, 2018 hearing and entered the May 10, 2018 order. The Honorable Joseph Walsh, III, presided over the October 22, 2018 hearing and entered the October 25, 2018 order.

by Mr. Dowd." Order, 10/25/18, at ¶ 7. Finally, and of particular significance to this appeal, the order directed that Mother "shall not relay, or cause to have relayed, any information to [M.C.] regarding the facts and circumstances of Father's inappropriate communications with [M.C.'s] half-sister [R.K.], absent Father's consent or further order of court." Id. at ¶ 8.

Mother filed a motion for reconsideration on November 5, 2018, in which she averred that the trial court erred by modifying the parties' custody award without considering the factors set forth at 23 Pa.C.S.A. § 5328(a). She also averred that the provision in the court's order prohibiting her from informing M.C. of Father's statements to R.K. was improper, because it prevented her from protecting M.C. from abuse, and made her responsible should R.K. inform M.C. of Father's statements. On November 7, 2018, Father filed a petition for special relief. Therein, Father averred that Mother might refuse to comply with the October 25, 2018 order, and requested that the court direct the police to enforce compliance. The court entered an order on November 13, 2018, directing the parties to comply with the October 25, 2018 order, and directing the police to enforce the order if either party disobeyed its provisions. Mother timely filed a notice of appeal on November 20, 2018, along with a concise statement of errors complained of on appeal.

Mother now raises the following issues for our review.

> A. The [trial c]ourt erred and abused its discretion in its October 25, 2018 Order issued as a result of [Mother's] Motion for Emergency Relief by reinstituting in part and modifying in part the underlying custody order entered May [10], 2018 by shortening

the initial period of unsupervised daytime visits at paragraph number 4(a) when the court failed to utilize the child's best interest standard as directed by 23 Pa. C.S.A. § 5328 and specifically 23 Pa. C.S.A. § 5328(a)(2) and instead used an appropriateness standard to allow unsupervised visits despite well documented evidence through testimony presented to the court by the direct supervisor of supervised visits and by the defendant, [Father], demonstrating [Father] acted sexually inappropriately in front of the child as soon as he learned he would no longer have unsupervised visits pursuant to the Custody Order [entered] May [10], 2018 and [Father] testified that he did not know when his behavior was inappropriate in front of the child until after the fact.

B.   The court order erred by restricting the [m]other's speech regarding "facts and circumstances of [F]ather's inappropriate communications with [M.C.'s] half-sister" because it substantially restricts [Mother's] ability to protect the child pursuant to 23 Pa. C.S.A. § 5328(a)(2), (a)(3) and (a)(8), limits her first amendment speech, is contrary to the child's best interests under 23 Pa. C.S.A. § 5328 and the evidence presented does not substantiate the "gag order" when testimony and evidence demonstrated that the child is naïve, does not recognize inappropriate sexual conduct and the father engages in such conduct in front of the child.

C.   The court erred by ordering the plaintiff [M]other to control speech of third parties[] (which would include [Father's] now adult step-daughter who is the child's half-sister) and prevent third parties from informing the child of "facts and circumstances of [F]ather's inappropriate communications with [M.C.'s] half-sister" because the court's order is overly broad, unduly burdensome, and does not conform to the best interest of the child standard under 23 Pa. C.S.A. § 5328.

Mother's brief at 3-4.

We review Mother's claims in accordance with our well-settled standard

of review.

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual

- 12 -

determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

V.B. v. J.E.B., 55 A.3d 1193, 1197 (Pa. Super. 2012) (citations omitted).

When a trial court makes an award of custody, the best interest of the child is paramount. S.W.D. v. S.A.R., 96 A.3d 396, 400 (Pa. Super. 2014). The factors that a court must consider when awarding custody are set forth at Section 5328(a):

(a) Factors.--In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.  A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

In its opinion, the trial court did not conduct an analysis of the Section 5328(a) factors. The court reasoned that it did not need to analyze the factors because its order did not award a form of custody, nor did it modify the form of custody set forth in its prior order of May 10, 2018. Trial Court Opinion, 12/18/18, at 17. It explained that it awarded unsupervised custody based on its credibility and weight determinations in favor of Father and Mr. Dowd.[8] Id. at 5-15. The court further rejected Mother's concerns regarding the provision prohibiting her from informing M.C. of Father's statements to R.K. The court reasoned that informing M.C. of these statements would cause her emotional harm. Id. at 18. It explained that K.C. is in counseling to address "problems created by hearing of Father's statements[.]" Id. It added that the provision did not make Mother responsible for the conduct of third parties. Id. at 19. The court observed, "[t]he order applies only to Mother's behavior in 'relaying' or 'causing to have relayed' the stated information, therefore, on its face the order does not require Mother to control the speech or behavior of anyone other than herself." Id.

In her first claim, Mother asserts that the trial court abused its discretion by "modifying and shortening the period of time for daytime unsupervised

_____

[8] The trial court also relied on the conclusion contained in Dr. von Korff's report that Father does not pose a threat to M.C. Trial Court Opinion, 12/18/18, at 12-15. As stated above, Dr. von Korff's report is not contained in the certified record.

visits." Mother's brief at 28. She maintains that the court's order was contrary to the evidence and unreasonable, and that the court should have considered M.C.'s safety pursuant to 23 Pa.C.S.A. § 5328(a). *Id.* at 29-38. She reviews the evidence presented during the custody proceedings at length, and argues that the court should have weighed and interpreted this evidence differently. *Id.* She also maintains that the court appeared to "protect" Father during the hearings and blamed her for Father's damaged relationship with K.C. *Id.* at 34-35.

As explained above, the trial court did not analyze the Section 5328(a) factors in its opinion. While the court states that it did not need to conduct an analysis of the factors, we disagree. Generally, a court must assess each of the factors at any time it modifies an award of custody.[9] **A.V. v. S.T.**, 87 A.3d 818, 822 (Pa. Super. 2014). Here, the trial court modified the parties' custody award by shortening the amount of time that Father would exercise unsupervised partial physical custody of M.C. during the day before beginning to exercise unsupervised custody overnight. While this may seem like a small change, we find that it was particularly important for the court to conduct a

_____

[9] Trial courts need not analyze the Section 5328(a) factors when considering "discrete and ancillary disputes relating to custody" such as "a dispute over a custody-exchange location; which youth sports the children should play; or whether a parent should be required to have children's toys, beds, or other things in his or her house." **S.W.D.**, 96 A.3d at 403 (footnote omitted).

full and thorough analysis of M.C.'s best interest, given the difficult facts of this case and the seriousness of Father's admissions regarding his statements to R.K.[10]

Moreover, even accepting for the sake of argument that the October 25, 2018 order did not modify the parties' custody award, it was still necessary for the trial court to conduct an analysis of the Section 5328(a) factors. This Court has explained that an analysis of the factors is required even when a court denies a petition to modify custody and orders the parties to comply with an existing custody order. S.W.D., 96 A.3d at 406. The critical inquiry in such a situation is whether the petition to modify requested a change to the underlying form of custody. See id. ("Even if the trial court only reaffirmed its prior order, it nonetheless was ruling upon a request to change the form of physical custody and, therefore, bound to decide whether the prior order remained in Child's best interest."). In the instant matter, Mother requested in her motion for emergency relief that the court modify the parties' underlying form of custody by eliminating Father's unsupervised custody with M.C. and restricting him to supervised custody only. Accordingly, we vacate the order of October 25, 2018, and remand for the court to assess the Section 5328(a) factors and enter a new custody order.

_____

[10] Father did not contest the provisions of the May 10, 2018 and October 25, 2018 orders limiting his contact with K.C. during the trial court proceedings and Mother does not contest those provisions on appeal. Accordingly, like the trial court, we focus our analysis on M.C.

We next turn our attention to Mother's interrelated second and third claims, in which she challenges the provision in the October 25, 2018 order prohibiting her from informing M.C. of Father's statements to R.K. In her second claim, Mother contends that this provision is improper because it restricts her ability to protect M.C. from Father indefinitely, violates her First Amendment right to free speech, and is contrary to M.C.'s best interests. Mother's brief at 38-44. Mother focuses her argument on this Court's recent decision in S.B. v. S.S., 2018 WL 6729838 (Pa. Super. 2018), reargument denied (Mar. 4, 2019), in which we addressed the circumstances under which a custody trial court may restrict a parent's speech. She asserts that a court may restrict a parent's speech only when it is causing or will cause harm to a child's welfare. Mother's brief at 39. She maintains that informing M.C. of Father's statements will not harm M.C. but may actually protect her from future abuse. Id. at 40, 42-44. Mother observes that none of the mental health professionals who testified during the proceedings recommended a restriction on her speech. Id. at 42-44. In her third claim, Mother maintains that the provision makes her responsible for ensuring that other people do not inform M.C. of Father's statements, and that it is unduly burdensome and overly broad. Id. at 44-47. She points out that R.K. continues to live in her home, as do both of the Children, and that, "it is likely the sisters will communicate . . . . and Mother will be blamed for the disclosure of Father's poor behavior." Id. at 45-46.

Upon review, the record does not support the trial court's determination that it would be in M.C.'s best interest to prohibit Mother from informing her of Father's statements to R.K.[11] While the court found that learning of Father's statements would be harmful to M.C., the court based this conclusion solely on the fact that K.C. does not want to see Father and attends counseling. The court heard no testimony from M.C.'s counselor, or from any other individual qualified to opine[12] on if, when, or how, M.C. should learn of these statements, or what harm she might experience as a result. To the extent the record does address these issues, Mother testified that she received advice from mental health professionals both supporting and opposing the idea of informing M.C. of Father's statements, and that she had discussed the matter with M.C.'s counselor. N.T., 10/22/18, at 48, 53. Therefore, the court's conclusion in this regard was speculative. Absent a more developed record on these issues, including the presentation of expert testimony, the court abused its discretion. See E.A.L. v. L.J.W., 662 A.2d 1109, 1119 (Pa. Super. 1995) (remanding a custody case because of, among other things, the trial court's "failure to obtain

_____

[11] We need not reach the merits of Mother's constitutional challenge, as we are able to resolve this appeal on other grounds. See Ballou v. State Ethics Commission, 436 A.2d 186, 187 (Pa. 1981) ("It is well settled that when a case raises both constitutional and non-constitutional issues, a court should not reach the constitutional issue if the case can properly be decided on non-constitutional grounds.") (footnote omitted).

[12] Ms. Olszewski testified that she possesses a bachelor's degree in mental health counseling and "many certifications in early childhood development" but she did not testify as an expert. N.T., 10/22/18, at 39-40.

expert testimony which was necessary to resolve the critical issues raised by the particular circumstances of this case, and the making of findings which were not supported by the evidence[.]").

As a final matter, the record also belies the trial court's decision to reject Ms. Olszewski's testimony and the recommendation of Erie Family Center that Father should not exercise unsupervised custody of M.C. In its opinion, the court focused on Ms. Olszewski's mistaken belief that the inappropriate video Father played for M.C., describing a comedian's dating experience, was of Bill Cosby. The court explained:

> The Erie Family Center notes document visits back to August of 2017. As Ms. Olszewski testified, the vast majority of the visits went very well. The first visit that appears to correspond with Ms. Olszewski's testimony of a problem is dated April 2, 2018 and relates to Father playing a YouTube video of Bill Cosby. The note indicates the video was about a boy getting his tonsils out and that M.C. became disinterested after watching it for five minutes. The note does not indicate that the video was off-color or the content otherwise inappropriate. It merely states parenthetically that Ms. Olszewski "felt the video an odd choice."
>
> The next indication of what Ms. Olszewski considered a problem at trial, was dated May 10, 2018 - over a month after the Bill Cosby incident. The note indicates that the visit went well, but toward the end they sat on the couch briefly and Father put his head on the child's shoulder. The note differs from Ms. Olszewski's in court [testimony] in that it says the incident occurred at the tail end of a visit, not when they were eating.
>
> The May 10, 2018 note also recorded that the Family Center was advised unsupervised visits would begin at the end of the school year. After the May 10, 2018 visit, there were only three more visits before the Family Center issued its recommendation that visits remain supervised: A visit May 14, 2018, when the "Siri call me sexy" incident occurred; A visit May 17, 2018 where two of the incidents occurred - the one where M.C. embarked on some

pretend kissing, and the one where Father started a video on YouTube of an off-color stand-up comedy routine and then shut it off (there is no mention of Bill Cosby in that note); and lastly, a visit on May 21, 2018 where M.C. reported she had watched the movie "Sandlot," which prompted Father to jokingly quote from the movie about kissing girls. Thus, it would appear that contrary to Ms. Olszewski's testimony, the incidents she found objectionable actually began well before Father was granted unsupervised visits. In comparing her testimony with her written notes, it appears Ms. Olszewski allowed some of the incidents to run together in her mind, and she reconstructed her timeline during her testimony, likely inadvertently, to support her conclusions that (1) Father's conduct was indicative of a problem, and (2) that it related to his knowledge that he would soon have the child unsupervised.

Trial Court Opinion, 12/18/18, at 13-14.

Contrary to the trial court's analysis, our review of notes of testimony and the Erie Family Center report indicates that every concerning incident that Ms. Olszewski reported took place shortly after Father learned that he would receive unsupervised custody of M.C. on May 10, 2018. The fact that Ms. Olszewski confused one of those incidents (the inappropriate comedy routine) with a prior incident she did not find concerning (the Bill Cosby video) does not indicate that the "incidents she found objectionable actually began well before Father was granted unsupervised visits" as the court determined. Id. at 14. Further, this minor inconsistency in Ms. Olszewski's testimony does not demonstrate that she "reconstructed her timeline during her testimony . . . to support her conclusions[.]" Id.

Based on the foregoing analysis, we vacate the trial court's October 25, 2018 order, and remand for further proceedings, including the presentation of

expert testimony. After hearing this additional evidence, the court shall enter a new custody order, along with an analysis of the Section 5328(a) factors. All provisions of the prior October 25, 2018 order, including the restriction on Mother's ability to inform M.C. of Father's statements to R.K., shall remain in effect until the court enters its new order.

Order vacated. Case remanded for further proceedings consistent with this memorandum. Jurisdiction relinquished.

President Judge Emeritus Bender joins this memorandum.

Judge Strassburger files a concurring and dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/8/2019